UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| GAIL M. M.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 3:18-CV-00432-MGG |
| | ) |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, | ) ) ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Plaintiff Gail M. ("Ms. M") filed her complaint in this Court seeking judicial review of the Social Security Commissioner's final decision to deny her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and Title XVI of the Social Security Act respectively. This Court may enter a ruling in this matter based on the parties' consent pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g). For the reasons discussed below, this Court **REMANDS** the Commissioner's final decision for further proceedings.

**PROCEDURE**

In her DIB and SSI applications dated April 22, 2014, Ms. M alleged an onset date of October 1, 2013. The Social Security Administration ("SSA") denied her application initially and upon reconsideration leading Ms. M to request a hearing before an

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name and last initial only.

administrative law judge ("ALJ"). Ms. M and her aunt, Ms. Williams, testified at the ALJ hearing on January 6, 2017. On March 10, 2017, the ALJ issued his decision denying Ms. M's applications for disability benefits having found her not to be disabled as defined by the Social Security Act. On April 10, 2017, the Appeals Council denied her timely request for review making the ALJ's decision the final decision of the Commissioner. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

Now ripe before this Court is Ms. M's request for judicial review of the Commissioner's decision under 42 U.S.C. § 405(g).

### BACKGROUND

Ms. M seeks disability benefits based on her impairments of carpal tunnel syndrome, orthopedic issues in her back, hips, knees, and ankles, osteoporosis, high blood pressure, anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), and depression. Ms. M worked previously at a hospital on the cleaning staff.

At the ALJ hearing, Ms. M appeared anxious and testified that she was scared. In fact, both the ALJ and her attorney had to reassure her multiple times about the process and offer suggestions to calm her. In describing her regular activities, Ms. M testified that she has bad days—which she defined as not being able to get out of bed— every day. Yet she also testified that she is able to use the bathroom and bathe, but sometimes needs help. Ms. M also testified that her aunt, Ms. Williams, assists her by making meals. She told the ALJ she could drive, but only out of necessity.

As to her physical symptoms, Ms. M testified that she is not able to squat, bend over, or carry anything due to arthritis in her knees, back, and shoulders and that she

2

suffers constant pain in her buttocks. She contended that she has issues both sitting and standing for longer than 5-15 minutes at a time and cannot walk without a walker.

Ms. M also reported mental symptoms including issues with concentration and memory, such as she is unable to remember what medications she takes. Ms. M further testified that she feels unable to deal with people. Ms. M visits her psychiatrist twice a week and was hospitalized for panic attacks five times in two years.

Ms. Williams then testified that she routinely visits Ms. M, who lives alone, and assists her with meals and her medications. Specifically, Ms. Williams noted that she has to remind Ms. M to take her multiple medications. Ms. Williams also testified that Ms. M does not stay in bed all day, but that she retreats to her room if anyone else comes over. She further reported that over time, she has witnessed Ms. M's physical impairments compound her mental impairments to the point that Ms. M covers her windows with sheets out of concern that people outside are talking about her.

After the hearing, the ALJ issued a written decision applying the five-step disability evaluation process described in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)[2]. At Step One, the ALJ found that Ms. M had not engaged in substantial gainful activity since the alleged onset date of October 1, 2013. At Step Two, the ALJ found that Ms. M suffered from severe impairments of degenerative disc disease of the lumbar spine, obesity, bilateral degenerative joint disease of the knees, unspecified peripheral neuropathy of the hands, borderline

---

[2] Regulations governing applications for DIB and SSI are almost identical and are found at 20 C.F.R. § 404 and 20 C.F.R. § 416 respectively. Going forward, this order will only refer to 20 C.F.R. § 404 for efficiency.

intellectual functioning, major depression/bipolar disorder, generalized anxiety disorder/panic disorder without agoraphobia, and ADHD. At Step Three, the ALJ found that Ms. M was not presumptively disabled after comparing her severe impairments to the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Before proceeding to the Step Four analysis, the ALJ determined that Ms. M retains the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), but never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs, stopping, kneeling, crouching, and crawling. The ALJ also found that Ms. M is able to understand, remember, and carry out instructions for simple, routine tasks; use judgment to make simple work-related decisions; and frequently respond appropriately to coworkers and the public. [DE 9 at 27]. Based on this RFC, the ALJ found at Step Four that Ms. M cannot perform her past relevant work as a hospital cleaner. At Step Five, however, the ALJ found that Ms. M can perform other jobs that exist in significant numbers in the national economy, namely marker, router, and collator operator as defined by the Dictionary of Occupational Titles. Accordingly, the ALJ determined that Ms. M has not been under a disability, as defined by the Social Security Act, from October 1, 2013, through the date of his decision. Ms. M now challenges the ALJ's decision.

Specifically, Ms. M argues that the ALJ's RFC determination is not supported by substantial evidence alleging that the ALJ did not properly weigh the medical opinions of record and therefore impermissibly "played doctor" resulting in error harmful to her.

4

## STANDARD OF REVIEW

On judicial review, the Social Security Act requires that the Court accept the Commissioner's factual findings if supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence must be "more than a scintilla by may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

A court reviews the entire administrative record but does not reconsider facts, reweigh the evidence, resolve conflicts in evidence, decide questions of credibility or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Thus, the question upon judicial review is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). The ALJ must build a logical bridge from the evidence to his conclusion, and a reviewing court is not to substitute its own opinion for that of the ALJ or re-weigh the evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

Minimally, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to confirm that the ALJ

5

considered the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2005). To assist the reviewing court, the ALJ must provide at least a glimpse into the reasoning behind his analysis and the decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). However, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## ANALYSIS

Ms. M's medical record includes a number of medical opinions regarding her physical and mental health. Ms. M contends that the ALJ unjustly discounted the opinions of Dr. John Kelly, M.D., Dr. Edmund Haskins, Ph.D., HSSP, and Jennifer Evans, FNP-BC and that the ALJ's improper weighting of these medical opinions was not harmless. In other words, Ms. M argues that the ALJ's RFC determination was not supported by substantial evidence because of this error. Ms. M saw Dr. Kelly, her treating physician, and Ms. Evans, a nurse practitioner under Dr. Kelly's supervision, at Healthlinc, Inc. from May 2013 to, at least, August 2015. On October 29, 2015, Ms. M visited Rehabilitation Hospital of Indiana where Dr. Haskins conducted a Resource Facilitation Neurovocational Evaluation as part of Ms. M's efforts to secure vocational rehabilitation services.

*Dr. John Kelly, M.D.*

On January 21, 2015, Dr. Kelly completed a form as part of Ms. M's application for vocational rehabilitation services. On that form, Dr. Kelly listed Ms. M's many diagnoses then opined that her prognosis is guarded. [DE 9 at 741]. More specifically,

Dr. Kelly reported that Ms. M could not be expected to maintain full time employment and that she could only stand for 15-20 minutes, walk for 5-10 minutes, frequently lift up to five pounds and occasionally lift 15 or 20 pounds. [*Id.*]. Dr. Kelly also indicated that Ms. M must avoid stress, hazards, heat, dust, pollution, and cold as well as jobs requiring alertness. [*Id.*].

In reviewing Dr. Kelly's opinion, the ALJ accurately outlined the details of Dr. Kelly's opinion before affording some weight to the lifting restrictions and little weight to his opinions overall. The ALJ explained that the lifting restrictions were consistent with Ms. M's medical record, but that overall, Dr. Kelly's opinions should be discounted further because he did not examine Ms. M longitudinally, "did not report supportive abnormal examinations," and opined some restrictions for impairments, such as bronchitis, that were not severe for twelve months or more as required under the disability statute or for impairments, such as depression and anxiety, that were outside his field of expertise. [DE 9 at 36].

Classifying Dr. Kelly as her treating physician, Ms. M argues that his opinion should have been given more weight consistent with the treating physician rule. Under the treating physician rule, more weight is generally given to the opinions of treating sources because they are more familiar with a claimant's conditions and circumstances. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). For claims like Ms. M's filed before March 27, 2017, a treating source's opinion is to be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R.

7

§ 404.1527(c)(2). When a treating source's opinion is not given controlling weight, the ALJ must consider the following factors: (1) the examining relationship, (2) the treatment relationship, specifically its length, nature, and extent, of the treatment relationship, (3) the supportability of the opinion, (4) its consistency with the record as a whole, and (5) the specialty of the treating source. *Id.*; *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). Additionally, the ALJ must provide good reasons in his decision for the weight given to the treating source's opinion and must not substitute his own judgment for the physician's opinion without relying on other medical evidence or authority in the record. *Id.*; *see also Sharbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Clifford*, 22 F.3d at 869.

Yet, the Commissioner argues that Dr. Kelly was not a "treating source" as defined by 20 C.F.R. § 404.1527(a)(1) because he only saw Ms. M twice—leaving her day-to-day care and treatment in the hands of Ms. Evans. Treating sources are a claimant's own acceptable medical source who provides, or has provided, medical treatment or evaluation and has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1527(a)(1)(2). An ongoing treatment relationship exists when claimant sees the medical source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [her] medical condition(s)." *Id.* The medical opinions of non-treating sources are not entitled to controlling weight. However, the opinions of examining physicians, such as Dr. Kelly, should be given more weight than non-examining physicians if they are consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(1)–(2).

8

Here, Ms. M does not dispute that Dr. Kelly only saw her twice. Instead, she seems to argue that by supervising Ms. Evans' admitted ongoing treatment relationship with her, Dr. Kelly can be considered to have had an ongoing treatment relationship with her. In support, Ms. M cites to multiple abnormal examinations recorded by Ms. Evans' in Ms. M's treatment records. She cites to none from Dr. Kelly. Ms. M also argues that examinations and opinions by other medical sources as well as diagnostic and imaging studies support Dr. Kelly's opinions.

Regardless of whether Dr. Kelly is deemed a treating source or not, the ALJ has satisfied his obligation to articulate reasons for the weight given to Dr. Kelly's opinion. First, Ms. M does not and cannot dispute the ALJ's conclusion that Dr. Kelly "did not examine [her] on a longitudinal basis." [DE 9 at 36]. Dr. Kelly may have been aware of and following the records of Ms. M through Ms. Evans' care, but he did not examine her regularly. Second, Ms. M has not shown that Dr. Kelly reported "supportive abnormal examinations" himself. [*Id.*]. All of Ms. M's cited treatment notes come from Ms. Evans or other doctors. And third, Ms. M does not and cannot dispute that Dr. Kelly opines about the effects of Ms. M's impairments, some of which would not qualify as disabling impairments under the statute and others that fall outside his field of expertise. In the end, the ALJ's stated reasons for discounting Dr. Kelly's reflect his consideration of the relevant Section 1527 factors, even if indirectly.

Therefore, the ALJ has provided "more than [the] scintilla" of evidence required to support his conclusion with substantial evidence. *See Skinner*, 478 F.3d at 841; *Roddy*, 705 F.3d at 636.

9

*Dr. Edmund Haskins, Ph.D., HSSP*

On November 5, 2015, Dr. Edmund Haskins, a neuropsychologist, prepared a report on the outcomes from a comprehensive neurovocational evaluation he conducted of Ms. M on October 29, 2015. Dr. Haskins' one-time evaluation was authorized as part of Ms. M's efforts to secure vocational rehabilitation services. Dr. Haskins' evaluation was "intended to provide a holistic assessment of [Ms. M's] cognitive, behavioral, [and] emotional strengths and weakness[es]." [DE 9 at 1056].

After taking about three pages of his ten-page report to document Ms. M's medical history as she recited it to him at the time of the exam, Dr. Haskins presented his observations of her during the examination along with the results of his comprehensive testing. He concluded that she would be "a good candidate for resource facilitation services" and that "[h]er goal of returning to work seems to be realistic and achievable, particularly if provided with the proper accommodations and resources." [*Id.* at 1098]. Dr. Haskins identified those accommodations as a job coach, relatively simply job, community work-base evaluation, medical evaluation, mood stabilizing medication, group psychotherapy, functional capacity evaluation, brain injury support group, brain injury education, and transportation. [*Id.*]. He then opined extensively on Ms. M's mental capabilities and described the type of employment that she would be able to perform as "extremely repetitive, structured and simple with minimal demands for active problem solving or complex information processing [and] relatively slow paced." [*Id.* at 1063].

The ALJ started his discussion of Dr. Haskins' opinion by identifying him as an "examining neuropsychologist" and then quoting his opinion that Ms. M has " . . . clear problems of behavioral self-control, cognitive, and intellectual impairment, [and] will need an extremely repetitive [job], structured and simple, with minimal demands for active problem solving or complex information processing [and] relatively slow-paced." [DE 9 at 36 (quoting *id.* at 1063)]. In so doing, the ALJ demonstrates that he did not ignore the general substance of Dr. Haskins' opinion. Nevertheless, the ALJ then gave Dr. Haskins' opinion "some weight but overall little weight" explaining that "even if relatively consistent with the residual functional capacity . . . , and based on a comprehensive examination, [Dr. Haskins' opinion] relied heavily on the claimant's reports and it was not a longitudinal assessment." [*Id.* at 36].

In assessing the weight to be given to Dr. Haskins' opinion, the ALJ once again applies the Section 1527 factors as required, even if indirectly. First, the ALJ acknowledged that Haskins is an examining specialist in this case. Second, he considered the nature of Dr. Haskins' treatment relationship with Ms. M by labeling it a "comprehensive examination," which showed its consultative and singular nature. Third, he attempts to assess the supportability of Dr. Haskins' opinion by concluding that his opinion relied heavily on Ms. M's self-reports. And fourth, he acknowledged consistency with the RFC and the comprehensiveness of the underlying examination.

Ms. M contends that Dr. Haskins' opinion should have been given more weight because he is a specialist in neuropsychology. Ms. M further criticizes the ALJ for discounting Dr. Kelly's opinion for lack of medical expertise, but then failing to give

11

more weight to Dr. Haskins' opinion despite his acknowledged specialty. Indeed, an ALJ generally affords more weight to the opinion of an examining specialist on issues related to his speciality. 20 C.F.R. § 404.1527(c)(5). Yet the ALJ was required to consider more than just Dr. Haskins' medical specialty when weighing his opinion. Moreover, the scope of Dr. Kelly's and Dr. Haskins' opinions are considerably different in light of their respective expertise. Dr. Haskins' opinion is much more detailed as to Ms. M's mental limitations than Dr. Kelly's opinion is—and appropriately so given his expertise as a neuropsychologist. Therefore, Ms. M's emphasis on Dr. Haskins' specialty, in isolation, is not determinative. *Cf. McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *12 (N.D. Ill. Feb. 6, 2012) (finding the weight given to a medical source opinion, based on an inconsistency with two other "incredibly similar" medical opinions, not to be supported by substantial evidence because the ALJ failed to adequately articulate his rationale for the conclusion of inconsistency).

However, Ms. M also challenges the ALJ's reliance on Dr. Haskins' lack of longitudinal history with her and Dr. Haskins' alleged reliance on her subjective complaints to justify discounting his opinion. The ALJ's longitudinal history and subjective complaint rationales do not adequately explain why the ALJ discounted Dr. Haskins' opinion, especially in light of Dr. Haskins' highly relevant medical specialty and the comprehensive nature of his neurovocational examination of Ms. M. The value of Dr. Haskins' opinion is his medical specialty. Therefore, the singular nature of his experience with Ms. M is a less dominant factor in the analysis. Moreover, the ALJ mischaracterized Dr. Haskins' opinion as being based heavily on Plaintiff's subjective

reports. As noted above, less than half of Dr. Haskins' report included Ms. M's self-reported medical history. The rest of the report included Dr. Haskins' expert conclusions based in part on Ms. M's subjective complaints but only in the context of his professional observations during her examination as well as the objective testing results generated from his comprehensive evaluation of her.

Therefore, the Court cannot trace the path of the ALJ's reasoning between the evidence on record and his determination that Dr. Haskins' opinion was only worthy of little weight. Without a logical bridge to his conclusion, the ALJ has failed to support the weight given to Dr. Haskins' opinion with substantial evidence. *See Steele*, 290 F.3d at 940; *Zurawski*, 245 F.3d at 889.

*Jennifer Evans, FNP-BC*

In November 2014, Ms. Evans opined in an open letter that Ms. M should have access to a handicapped apartment. [DE 9 at 696]. Then, in March 2016, in a form for vocational services prepared for Ms. M., Ms. Evans opined physical limitations that mirrored those in Dr. Kelly's January 2015 opinion. [*Id.* at 1101][3]. Although the ALJ found her familiarity with Ms. M's conditions to be longitudinal, he stated that "her concurrent examination findings [did] not support the . . . restrictions" she opined and consequently afforded her opinion only little weight. [*Id.* at 36]. Ms. M argues that Evans' opinion should have been afforded more, if not controlling weight, as Ms. Evans was the most familiar with her condition. In opposition, the Commissioner argues that

---

[3] The ALJ discussed Ms. Evans' March 2016 opinion in his decision but miscited Exhibit 8F/18, which is Dr. Kelly's January 2015 opinion. Ms. Evans' opinion is located at Exhibit 8F/25 in Ms. K's administrative record, which is reflected in the Court's citation above.

13

Ms. Evans' opinions are not entitled to any special treatment or weight because as a nurse practitioner, she is a non-acceptable medical source. However,

> it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SSR 06-3p[4] As discussed above and acknowledged by the ALJ, Ms. Evans was supervised by Ms. M's treating source, Dr. Kelly, and was the most familiar with Ms. M's conditions on a longitudinal basis, thus meeting the requirements set forth by SSR 06-3p. Therefore, Ms. Evans' opinion should not have been dismissed automatically because she was only a nurse practitioner.

While it is not clear from the decision whether the ALJ even recognized the mandate of SSR 06-3p to consider Ms. Evans' opinion in light of her longitudinal treatment of Ms. M, it is clear that the ALJ did not cite to any medical records to show that the physical restrictions opined by Ms. Evans were unsupported by "her concurrent examination findings." [DE 9 at 36]. Without more, the Court cannot trace the evidence the ALJ relied up to determine that Ms. Evans' examination findings failed to support her opinion. Additionally, the Court cannot be certain that the ALJ was not impermissibly "playing doctor" and drawing his own conclusions about Ms. M's limitations. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). In other words, the ALJ's decision fails to build a logical bridge from the record to his decision to discount Ms. Evans' opinion such that it is not supported by substantial evidence.

---

[4] SSR 06-3p was rescinded for claims filed on or after March 27, 2017. 82 Fed. Reg. 15,263. Ms. M's claim was filed before March 27, 2017. Therefore, SSR 06-3p is properly applied to her claim.

14

*Harmful Error*

Finally, Ms. M argues that the wrongful discounting of these three medical opinions was harmful. Dr. Kelly's and Dr. Evans' opinions both limited Ms. M to less than sedentary work and Dr. Haskins opined academic limitations—none of which was accounted for in the RFC and therefore not in the Step Five conclusion that jobs exist in significant numbers in the national economy that Ms. M can perform.

The ALJ's failure to articulate adequately his rationale for the weight given to Dr. Haskins' and Ms. Evans' opinions leaves the Court unable to determine whether the ALJ considered potentially important evidence from those opinions. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2005). And if these opinions were improperly weighted, the RFC and Step Five determinations for Ms. M could be different and could lead to a different outcome as to her disabled status under the Social Security Act. Therefore, the risk of harmful error justifies Ms. M's request for remand.

Finding remand necessary given the ALJ's failure to support his conclusions about Dr. Haskins' and Ms. Evans' opinions with substantial evidence, the Court need not address Plaintiff's argument that the ALJ impermissibly "played doctor" by giving all medical opinions regarding Ms. M's physical limitations little weight and arguably leaving no medical opinion to rely upon as evidence for his RFC finding.[5] The Seventh Circuit and this Court have repeatedly recognized that the ALJ is not required to rely

---

[5] In support, Ms. M relies upon *Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009) and *Rohan v. Chater*, 98 F.3d 966, 970–71 (7th Cir. 1996). *Cf. Burk v. Berryhill*, Case No. 3:17-CV-00870-MGG, 2018 WL 5129794, at *3 (N.D. Ind. Oct. 22, 2018) (distinguishing *Terry* and *Rohan* from the proposition by the plaintiff that "the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not accord strong weight to any medical source regarding [the plaintiff's] physical RFC determination.").

entirely on a particular physician's opinion, nor must the ALJ choose between the opinions of any of the claimant's physicians. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); *Hannah-Walker v. Colvin*, No. 2:12-cv-61-PRC, 2013 WL 5320664, at *10 (N.D. Ind. Sept. 23, 2013). Further, determination of a claimant's RFC is a matter, not for the treating or examining physicians, but for the ALJ alone. *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). The final responsibility for the RFC determination at the administrative law judge hearing remains exclusively with the ALJ. 20 C.F.R. § 404.1546(c). Therefore, Ms. M's argument here is misplaced.

## CONCLUSION

For the above reasons, the Court concludes that the ALJ failed to provide the logical bridge necessary to support his decision with substantial evidence as required by 42 U.S.C. § 405(g). Accordingly, the Commissioner's decision is **REMANDED** for further proceedings consistent with this order.

**SO ORDERED** this 23rd day of September 2019.

> s/Michael G. Gotsch, Sr
> Michael G. Gotsch, Sr.
> United States Magistrate Judge